Susan Giambrone, individually, and as mother and next friend of Jake Giambrone, a minor, appeals from a summary judgment in favor of Michael Douglas, the former head wrestling coach for Auburn High School; Charles Furlow, the athletics director at Auburn High School; and Dr. Cathy Long, the principal of Auburn High School (the defendants are hereinafter referred to collectively as "the faculty members"), based upon discretionary-function immunity, now referred to as State-agent immunity.[1] We reverse in part, affirm in part, and remand. *Page 1049 
 I. Facts and Procedural History
At the time of the incident that forms the basis of this action, Jake was a 15-year-old freshman at Auburn High School and had recently become a member of the school's wrestling team. Douglas, a certified teacher and the head wrestling coach, scheduled a team practice for December 27, 2000. At the practice, Jake and Douglas were "kidding around" and "poking fun" about whether Jake could win a wrestling match against Douglas. Douglas weighed approximately 200 pounds, and Jake weighed approximately 130 pounds. Although Jake testified that he did not know who initiated the challenge match, Douglas testified that Jake challenged him to wrestle at practice and that he accepted the challenge because he believed it would be "motivational" for his wrestling team.
As the other members of the wrestling team watched, Jake and Douglas began to wrestle in a "full-speed" challenge match. According to Douglas, Jake "immediately shot in with his head down" and attempted to grab Douglas's legs. Douglas testified that he countered Jake's move by "sprawling"[2] away from Jake. Douglas testified that he then attempted a "cement job," an offensive move that involved Douglas's wrapping his arm underneath Jake's arm in an effort to roll Jake over and bring him down to the mat. However, as Douglas was performing this move, he heard a "pop," and he released Jake. Jake testified that immediately following the move he could no longer feel his feet. Jake was transported to the hospital; it was determined that he had suffered a severe spinal-cord injury. As a result, he is a quadriplegic.
The "cement job" move was one of the first wrestling techniques the members of the wrestling team were taught. Jake testified that when Douglas attempted to perform the "cement job," Douglas failed to properly encircle Jake's arm and that that failure to execute the move properly led to his injury. However, Douglas, along with an assistant coach and other team members, testified that Douglas had performed the move properly.
At the time the incident occurred, Douglas was in his first year as head wrestling coach. Although Douglas had previously coached football and baseball, he had no experience coaching wrestling. Douglas did not attend a wrestling clinic before he began coaching the wrestling team; he testified that he was not given an opportunity to attend such a clinic.
Long, the principal of Auburn High School, testified that her supervision of the athletic programs at the high school was indirect and that she had deferred coaching recommendations to Furlow, the athletics director. Furlow testified that he had recommended Douglas to the Auburn City Board of Education ("the Board") because of Douglas's superior coaching abilities and his good relationship with the students. He testified that the only criterion for selecting a coach was that the coach have a teaching certificate. Based upon Furlow's recommendation, the Board hired Douglas as the head wrestling coach at Auburn High School.
The Board also hired two coaching aides, John Gregg and Aaron Tutwiler; the aides were hired based upon Furlow's recommendation. The Board hired the aides to assist Douglas during the wrestling practices and to teach the members of the wrestling team the technical aspects of the sport of wrestling. Gregg and Tutwiler both had been members of wresting teams while they were in high school, had *Page 1050 
taught wrestling techniques during summer wrestling camps at junior high schools, and had worked in conjunction with the Auburn University club wrestling team.
Douglas testified in his affidavit that he learned wrestling techniques from Gregg and Tutwiler and from watching wrestling videotapes. He described his duties as head coach:
 "5. I was not provided any guidelines on how to run wrestling practices. Although I consulted with my assistant coaches, I made the final decisions on how practices were to be run. Working within the school schedule, I made the final decision as to when practices would take place and how long they would last. I made the final decisions on what drills the wrestlers needed and how long the drills should last. I was responsible for motivating the wrestlers and made the final decision concerning such. I made the final decision as to who would be a `starter' at matches, which included evaluating the skill level of each student athlete on the team. I used my own discretion and judgment based on my education, experience and training in making such decisions.
 "6. No one instructed me not to wrestle with the student wrestlers. In my own discretion and judgment, based on my education, experience and training, I accepted a challenge to wrestle with student wrestler Jake Giambrone at wrestling practice, believing this was motivational for the wrestling team.
 "7. Due to my education, experience and training, I am familiar with the standard of care required of a high school athletic coach in the State of Alabama during the 2000-2001 school year. At all times relevant to this lawsuit, I met that standard of care."
On May 29, 2001, Giambrone, individually, and as mother and next friend of Jake, brought this action. In it she alleged that Douglas was negligent and wanton in wrestling with Jake without having the proper qualifications or training. Giambrone also alleged that Furlow and Long had been negligent and wanton in failing to provide a qualified coach for the wrestling team. Giambrone claimed that the decisions and actions of the faculty members that had resulted in Jake's injury did not involve the exercise of judgment.
The faculty members filed a summary-judgment motion, as well as a summary of undisputed facts, a brief, and evidentiary material. The faculty members argued, among other things, that they were entitled to State-agent immunity. Giambrone opposed the summary-judgment motion and filed evidentiary material supporting her claims. The trial court entered a summary judgment in the faculty members' favor based on State-agent immunity.
 II. Standard of Review
Our review of a summary judgment is de novo. "A motion for summary judgment is granted only when the evidence demonstrates that `there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c), Ala.R.Civ.P."Reichert v. City of Mobile, 776 So.2d 761, 764 (Ala. 2000). We apply "the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact."Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); System DynamicsInt'l, Inc. v. Boykin, 683 So.2d 419, 420 (Ala. 1996). In order to defeat a properly supported motion for a summary judgment, the nonmoving party must present substantial evidence creating a genuine issue of material fact. "Substantial evidence" *Page 1051 
is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
 III. Discussion
Giambrone claims that the faculty members violated clear guidelines and rules that govern their respective positions. Giambrone claims that Douglas is not entitled to State-agent immunity because (1) he failed to attend a wrestling clinic hosted by the Alabama High School Athletic Association ("the AHSAA"), which all wrestling coaches were required to attend and at which potentially dangerous and illegal holds would have been discussed; (2) he violated the competition guidelines as promulgated by the National Federation of Wrestling ("NFW"); and (3) he engaged in "inequitable competition" with Jake in violation of the code of conduct contained in the Alabama High School Athletic Directors and Coaches Association Directories ("the Athletic Directories"). Giambrone also claims that Furlow is not entitled to State-agent immunity because he violated the rules of the AHSAA in failing to send Douglas to a mandatory wrestling clinic. Finally, Giambrone claims that Furlow and Long violated the guidelines of the AHSAA in hiring Douglas. Giambrone claims that, because of the failure to follow the rules governing their positions and their failure to exercise due care, the faculty members are not entitled to the protection of State-agent immunity as restated in Ex parte Cranman,792 So.2d 392 (Ala. 2000).
The faculty members claim that they are entitled to State-agent immunity because, they say, their actions fall within their duties of supervising personnel and educating students. They point out that the guidelines and rules Giambrone alleges they violated were not adopted by the Board, and, therefore, the rules were not applicable to and did not impose any duties on the faculty members. Even if the rules were applicable to them, they argue, the rules Giambrone relies on are not so specific as to impose a duty upon them. The faculty members also argue that Giambrone failed to present substantial evidence to support her claims that the faculty members had been negligent and wanton and that their negligence and wantonness had caused Jake's injury.
In Cranman, this Court restated the doctrine of State-agent immunity as follows:
 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
 "(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, *Page 1052 
law-enforcement officers' arresting or attempting to arrest persons; or
 "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405 (first and last emphasis original; other emphasis added).
We have established a "burden-shifting" process when a party raises the defense of State-agent immunity. Ex parte Wood, [Ms. 1011916, December 6, 2002] 852 So.2d 705 (Ala. 2002). In order to claim State-agent immunity, the faculty members bear the burden of demonstrating that Giambrone's claims arise from a function that would entitle them to immunity. Wood, 852 So.2d at 709; Ryan v. Hayes, 831 So.2d 21 (Ala. 2002). If the faculty members make such a showing, the burden then shifts to Giambrone, who, in order to deny the faculty members immunity from suit, must establish that the faculty members acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority.Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." Ex parte Butts,775 So.2d 173, 178 (Ala. 2000).
 A. Douglas
Giambrone's action against Douglas arises from the decision Douglas made to engage in a wrestling match with Jake in an attempt to motivate the members of the wrestling team. Such a decision involves the exercise of judgment in educating students, a category included in the Cranman
restatement of State-agent immunity. 792 So.2d at 405. Nevertheless, Giambrone argues that Douglas was engaged in a ministerial act and that he was not "exercising judgment" because, she says, he violated clear rules and regulations governing his position as head coach of the wrestling team.
State agents are entitled to immunity for actions taken in the exercise of their judgment in educating students when they are discharging duties imposed by statute, rule, or regulation. Ex parte Nall, [Ms. 1012099, June 6, 2003] ___ So.2d ___ (Ala. 2003); Ex parte Spivey, [Ms. 1011128, September 27, 2002] 846 So.2d 322 (Ala. 2002); Ex parte Blankenship,806 So.2d 1186, 1190 (Ala. 2000); Cranman, 792 So.2d at 405. In Nall, a high-school student was injured during baseball practice while one coach was hitting balls and another coach was instructing runners how to "read" the ball after the coach hit each ball. One of the batted balls struck a student, who had been instructed to watch the practice drill, in the head. ___ So.2d at ___. The student sued the coaches, claiming that they had been negligent and wanton in conducting the practice and in supervising the players. ___ So.2d at ___. We acknowledged in Nall that the Escambia County Board of Education had not adopted any rules or regulations specifying how the baseball practices at the high school were *Page 1053 
to be conducted. ___ So.2d at ___. We concluded that the coaches were entitled to State-agent immunity because they exercised "broad judgment in planning the safe conduct of the session and in deciding whether safety hazards existed." ___ So.2d at ___. See also Blankenship, 806 So.2d at 1190 (State-agent immunity protects agents in the exercise of judgment in educating students, and "[w]e will not second-guess their decisions").
In the present action, the guidelines and rules Giambrone alleges the faculty members violated all promote safety in the sport of wrestling. The AHSAA is an association organized by member schools to control and promote athletic programs in high schools in Alabama. Among other things, it provides mandatory clinics for head coaches. The NFW governs high-school wrestling and provides rules for wrestling competitions such as, for example, which wrestling moves are illegal and unsafe. Finally, the Athletic Directories is an association designed to foster professional relationships among coaches of this State. It provides that all coaches shall be carefully selected and well trained and that coaches should not arrange competition between individuals whose physical abilities are widely disparate.
However, as was the case in Nall, the rules and regulations cited by Giambrone were not adopted by the Board. Dr. Terry Jenkins, the superintendent of the Auburn City School System, testified:
 "As Superintendent of the Auburn City School System, I am familiar with the rules, regulations, policies and procedures of the [Board]. The [Board] has not at any time adopted the Constitution, the Athletic Code for Coaches, the Code of Ethics for Coaches or any other recommendations or suggestions contained in [the Athletic Directories]. The [Board] does not require its principals, athletic directors or coaches to follow the recommendations or suggestions contained in said [Athletic Directories].
 "There were no rules, regulations, policies or procedures adopted by the [Board] that established how wrestling practice was to be conducted on December 27, 2000, or at any other time. No rules or guidelines of [the NFW] or [the AHSAA] or [the Athletic Directories] had been adopted by the [Board] as applicable to practice activities."
(Emphasis added.) Thus, the Board had not imposed any mandatory requirements on how Douglas was to conduct each wrestling practice; instead, Douglas was permitted to exercise broad judgment in the education of his students. See Nall, ___ So.2d at ___.
Our inquiry does not end here, however. Under our standard in Cranman, as applied in Butts, State-agent immunity is unavailable to Douglas if he "failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." Butts, 775 So.2d at 178. UnlikeNall, in this case Furlow, who was in a supervisory position, furnished Douglas with the guidelines and rules of the AHSAA, the NFW, and the Athletic Directories, and we must consider whether Furlow's furnishing those guidelines and rules imposed a duty upon Douglas to regulate his conduct during the practices of the wrestling team.
It is clear from the record that the Board gave Furlow broad authority to supervise the coaches employed at Auburn High School and to impose on them any duties he believed were necessary to perform their jobs. Furlow testified that he was responsible for "administering" the athletics program and that he reported directly to the superintendent of the Auburn City School System. He also testified that he conducted an annual meeting *Page 1054 
of the coaches of Auburn High School in which he instructed the coaches (1) to follow the guidelines of the AHSAA,[3] which, according to Furlow, answer questions concerning the "dos and don'ts" of each sport; (2) to complete their applications for the Athletic Directories and to follow the guidelines in the Athletic Directories; and (3) to complete their paperwork regarding administrative issues such as transportation and purchase orders. Furlow also testified that he provided Douglas with a book containing rules promulgated by the NFW in order to make sure that Douglas knew the rules for conducting wrestling matches. Although Furlow was not directed by the Board to impose on the coaches at Auburn High School the guidelines and rules of the AHSAA, the NFW, and the Athletic Directories, it was within the exercise of his judgment to "insist" that the coaches comply with those guidelines and rules.
Therefore, Douglas's "broad authority" to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed by Furlow. For example, the code of conduct contained in the Athletic Directories provided that coaches should not arrange competitions between individuals whose physical abilities are widely disparate. This rule reasonably can be construed to apply to a challenge match between a coach and a student. Moreover, a wide disparity existed between Douglas, who was 29 years old and weighed approximately 200 pounds, and Jake, who was 15 years old and weighed approximately 130 pounds. Steven Gaydosh, an expert witness presented by Douglas who had 21 years of experience as a head wrestling coach, testified that Douglas and Jake did not have "equal physical ability." The challenge match between Douglas and Jake violated the code of conduct for coaches contained in the Athletic Directories, which Douglas, as mandated by Furlow, was required to follow. Furthermore, the AHSAA and the NFW provide rules addressing potentially dangerous wrestling holds and illegal headlocks. Under the NFW rules, "any headlock in which the arms or hands are locked around the opponent's head without encircling an arm . . . or leg" is illegal. The NFW rules also indicate that a hold that forces a body part to the limit of the normal range of movement is potentially dangerous and could be considered an illegal move. Jake testified that Douglas improperly failed to encircle his arm in executing the move during the challenge match that led to his injury. Douglas, an assistant coach, and other team members all testified that Douglas properly performed the move. Viewing the evidence in the light most favorable to Giambrone, as we are required to do in our review of a summary judgment,[4] we cannot determine, as a matter of law, that Douglas's technique while engaging in the challenge match with Jake was proper according to the guidelines provided by the AHSAA and the NFW rules.
Douglas argues that the guidelines and rules Giambrone alleges he violated cannot give rise to a legal responsibility in the absence of their formal acceptance or adoption by the Board. However, Furlow specifically furnished the guidelines and rules to the coaches at the annual coaches *Page 1055 
meeting. In authorizing the use of the guidelines and rules by the coaches, Furlow exercised that judgment the Board allowed him to exercise. We cannot agree that such guidelines and rules must be adopted by the Board before they can create a duty on Douglas's part.
Douglas also contends that the guidelines and rules are not sufficiently detailed enough to create specific duties, citing Spivey, supra, and Butts, supra. In Spivey, a student injured while using a shaper that lacked certain safety guards sued his teacher and the teacher's supervisor. The student claimed that the teacher had removed a guide fence from the shaper and that the removal of the guide fence led to his injuries. 846 So.2d at 332. The student claimed that neither his teacher nor his teacher's supervisor was entitled to State-agent immunity because, he argued, the teacher failed to follow what the student alleged to be "clear rules and regulations" concerning the safety of the shaper. 846 So.2d at 332. The student cited regulations including, among others, guidelines from the faculty handbook and job descriptions that stated that teachers should ensure the safety of the students and report injuries. We concluded that those safety guidelines were "general statements" regarding safety and that they were not the type of "`detailed rules and regulations' that would remove a State agent's judgment in the performance of required acts." 846 So.2d at 333 (quotingButts, 775 So.2d at 178).
The guidelines in Spivey merely established the general responsibility to apply safety rules to the conduct of students and teachers; here, the guidelines and rules provided specific instructions regarding the proper techniques to be used in coaching the sport of wrestling. The guidelines and rules removed Douglas's judgment in determining whether he should participate in a "full speed" challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an "inequitable" challenge match, thereby failing to discharge his duties pursuant to "detailed rules or regulations," we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not meet his burden of establishing that his actions and decisions involved functions that entitled him to immunity.
 B. Furlow and Long
Giambrone's action against Furlow and Long arises from Furlow's decision to recommend Douglas to the Board as the head wrestling coach and Long's decision to defer such recommendations regarding athletic personnel to Furlow. Both decisions involved the exercise of judgment in educating students or in supervising personnel, categories within theCranman restatement of State-agent immunity. 792 So.2d at 405. However, unlike the duties Furlow imposed upon Douglas by his acceptance of the AHSAA guidelines and the NWF rules, no guidelines or rules were imposed upon Furlow and Long specifying how Furlow should choose a coach for the wrestling program and how involved Long should have been in the hiring process for athletic personnel. Because the Board had not adopted any guidelines or rules addressing those issues, Furlow and Long "were left to exercise broad judgment" in making their respective decisions regarding the appropriate level at which to supervise personnel, the qualifications required in a wrestling coach, and the safety measures that were to be provided at each wrestling practice. *Page 1056 
See Nall, ___ So.2d at ___; Spivey, 846 So.2d at 331.
Giambrone also claims that the AHSAA guidelines mandated that Furlow send Douglas to a wrestling clinic at which potentially dangerous and illegal holds would have been discussed. Douglas did not attend the wrestling clinic, and Furlow testified that he had merely assumed that Douglas had attended the clinic because he did not receive a notice from the AHSAA indicating that he had not. According to Giambrone, Furlow's failure to follow the mandate of the AHSAA abrogates his State-agent immunity. However, Furlow was not required by the Board or any other entity or person in a supervisory position to follow the AHSAA mandates. While Furlow had the authority to require subordinates to comply with those rules, his failure to submit himself voluntarily to those rules does not make his conduct a violation of "duties imposed on a department or agency by statute, rule, or regulation." Cranman, 792 So.2d at 405. Furlow exercised his own judgment in determining the extent to which he should follow the AHSAA mandates and in determining the level of training required for new coaches. Furlow is entitled to immunity from liability because in supervising Douglas he was exercising his judgment.
Even assuming that Furlow and Long were under a mandatory duty to follow the guidelines and rules Giambrone argues they should have been following, the guidelines and rules that applied to Furlow and Long, unlike the guidelines and rules that applied to Douglas, were not sufficiently detailed to impose specific duties. See Spivey, 846 So.2d at 331-32; Ex parte Butts, 775 So.2d 173 (Ala. 2000) (State-agent immunity withheld if a State agent fails to discharge duties pursuant to "detailed rules or regulations"). The Athletic Directories provide that coaches are to be "carefully selected" and "well-trained members of the school staff." It also states that a coach should "show a mastery of the principles that he is going to teach" and that "athletes have a right to expect the coach to have a genuine and up-to-date knowledge of that which he proposes to teach." The AHSAA provides that the high-school principal "shall be ultimately responsible in all matters" relating to high-school sports. These general statements are not the type of detailed rules and regulations that could remove the exercise of Furlow and Long's judgment in the performance of required acts. See Spivey, 846 So.2d at 331-32. Furlow and Long met their burden of establishing that their actions and decisions involved functions entitling them to immunity.
In order to deny Furlow and Long immunity from suit, therefore, Giambrone must establish that they acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. See Cranman, 792 So.2d at 405; Wood, 852 So.2d at 709. Giambrone initially claimed that Furlow and Long acted beyond their authority by violating the guidelines or rules promulgated by the AHSAA, the NFW, and the Athletic Directories. However, because the guidelines and rules do not impose mandatory duties upon Furlow and Long, the decision whether to follow the guidelines and rules was within their judgment.
Giambrone also argues in her reply brief that Furlow and Long acted in bad faith by failing to adhere to the same safety rules that they had previously promised parents and students they would adhere to. Giambrone refers to the waiver in the high school's liability insurance policy in which the faculty members promised to "abide by all written rules regarding behavior and safety." As previously stated, Furlow and Long were not required to follow any of the guidelines and rules Giambrone *Page 1057 
argues they violated. As educators, they are required to exercise their judgment in supervising personnel and in educating students. Moreover, it is well-settled that Giambrone may not raise an issue for the first time in a reply brief filed on appeal. See Sanders v. Smitherman, 776 So.2d 68,73 n. 4 (Ala. 2000).
With the benefit of hindsight, one might conclude that judgment could have been better exercised and the incident avoided if Furlow had recommended a coach with more wrestling experience or if Long had been more involved in Douglas's hiring. See Spivey, ___ So.2d at ___. However, under our standard in Cranman, supra, we do not hold State agents answerable in money damages for the consequences of poor judgment in the education of students. The immunity afforded State agents who exercise their judgment in the education of students and the supervision of personnel is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Cranman, 792 So.2d at 405. The facts here do not fit within this exception to State-agent immunity.
 IV. Conclusion
We reverse the summary judgment in favor of Douglas, affirm the summary judgment in favor of Furlow and Long, and remand the case for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
SEE and BROWN, JJ., concur specially.
MOORE, C.J., recuses himself.
[1] The immunity available to individuals sued for actions taken on behalf of the State is now referred to as "State-agent immunity." Exparte Cranman, 792 So.2d 392, 397 (Ala. 2000). See also Ex parte Butts,775 So.2d 173 (Ala. 2000), in which a majority of this Court adopted theCranman restatement of the rule governing State-agent immunity.
[2] "Sprawling" is a wrestling technique in which a player throws his legs back, typically landing on his knees, in order to avoid having his legs grabbed by his opponent.
[3] Furlow testified that Auburn High School is a member of the AHSAA.
[4] See Ex parte Coleman, [Ms. 1010644, March 14, 2003] ___ So.2d ___ (Ala. 2003) (when considering a summary-judgment motion, "[t]he court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party").