Hattie Randall, a social worker employed in Mobile County by the Department of Human Resources ("the Department"), petitions this Court for a writ of mandamus directing the Montgomery Circuit Court to vacate its order denying her motion for a summary judgment based on State-agent immunity in this wrongful-death action against her and to enter a summary judgment in her favor based on that defense. We grant the petition.
 Facts
Douglas Hernandez, the two-month-old son of Robert D. and Mary L. Hernandez, died on August 30, 2002, while he was in the care of Melinda Poplin, who was operating Tiny Tots Family Day Care. Toxicology reports revealed the presence of several over-the-counter cough and cold medications in Douglas's blood, and his death was ultimately ruled a homicide. Douglas's parents sued the Department, its commissioner, and Hattie Randall, who at the time the parents filed the action had been employed by the Department for 18 years.[1] The Hernandezes alleged wrongful death and fraud and sought injunctive relief. Randall moved for a summary judgment, asserting as a defense State-agent immunity. After a hearing, the trial court denied Randall's motion. Randall filed this petition for the writ of mandamus. *Page 654 
At the time of the events made the basis of this action, Randall was serving as a day-care-licensing consultant for the Department. Randall's duties included visiting licensed and prospective licensed group-day-care home providers to evaluate the homes for purposes of licensing. At that time, Poplin was operating Tiny Tots Family Day Care out of her home and was licensed to care for as many as 12 children ranging in ages from infancy to 12 years old. Poplin had been a licensed group-day-care home operator since 1993.
Poplin had been notified by the Department in October 2001 that her license would soon expire and that she needed to submit an application for renewal. Poplin completed the license-renewal application and submitted it to the Department on February 13, 2002. Randall made an unannounced visit to the Poplin home on April 9, 2002, to evaluate it for the purpose of determining whether to renew Poplin's license.[2] During the evaluation, Randall reviewed certain records that Poplin was required to maintain pursuant to the Department's minimum standards.[3]
Section F.3.g. of those standards require that the home-day-care provider maintain certain records relating to the children in the provider's care, including (1) each child's preadmission form, (2) written medication authorizations, and (3) immunization certificates. The day-care provider must maintain these records two years after a child leaves the day-care home. Section E.2.d(1) of the minimum standards provides as follows regarding the written medication-authorization forms:
 "No medication or medical procedures (prescription or over-the-counter) shall be administered without a written, signed authorization form from the child's parent(s)/guardian(s). Blanket authorization forms are prohibited. The authorization form shall include time(s) and date(s) to be administered, dosage, storage instructions, and specific *Page 655 
directions for administering the medication/medical procedure, such as give by mouth, apply to skin, inhale, drops in eyes, etc. An authorization form shall be valid for no more than seven (7) days, unless accompanied by a written physician's statement."
(Emphasis in original.)
The licensing consultant is provided with a "Children's Records Checklist" to be completed when reviewing the records of the day-care provider. Randall determined that Poplin's records were not in compliance with the minimum standards. She indicated on the records checklist that Poplin had immunization certificates for only 2 of the 12 children in her care and that she had no preadmission forms for any of the children. Additionally, Poplin had no written medication-authorization forms on file for the children. However, Randall indicated on the records checklist that the written medication-authorization forms were not applicable to Poplin under the minimum standards. Randall stated that a written medication-authorization form is to be included in a child's file only if the day-care provider has administered medication to that child. Randall testified as follows regarding the medication-authorization forms:
 "Q. Why did you determine that [the medication-authorization form] wasn't applicable?
 "A. Minimum standards states that two forms are required for a child's checklist or to complete a child's file, and that is the preadmission form and the immunization certificate.
 "Q. Why would that form have a blank for medical authorization on it?
 "A. If it was needed.
 "Q. Well, what would be a circumstance when it would be needed when you were doing this evaluation?
 "A. If a child had been given medication, then the form should be there.
 "Q. So was it your belief when you were doing this record check that she had never given a child medication?
 "A. She had no medical authorization forms.
 "Q. Yes, ma'am. And so as an evaluation person, did you believe that she had never given the children medication?
 "A. When I do an evaluation, I check her files and I check what [is] there.
 "Q. Okay.
 "A. And if there are no forms, then she has not given any medication because the form is not there.
 "Q. Okay. And how long would she be — if she had given medication to children and she had filled out those forms, how long would she have to keep them?
 "A. A file is kept as long as a child is there.
 "Q. They don't have to keep a file any longer than how long the child is there?
 "A. If the child has not been in the home in over two years then they do not have to keep the files.
 "Q. Okay. So if the child leaves, then they've got to keep the file for two years?
 "A. Yes, sir.
 "Q. Did you look at any files on children other than the ones that were actually there at the time?
"A, No, sir.
 ". . . .
 "Q. When you found that the child — the children that were currently there had no record of ever having a medical authorization for medication, did that — and with your experience of 18 years *Page 656 
with the department, did that trigger any thought that, you know, maybe she's not keeping these records?
 "A. No, sir.
 "Q. Did it lead you to believe, you know, I might better look at these other children that used to be here to see if she's ever given medication to a child in her day care?
 "A. No, sir."
Randall marked the "Compliance" box on a child-care home-licensing evaluation form with a "D," indicating that Randall had discussed with Poplin compliance with the Department's standard requiring a written authorization form before she could administer medication to a child in her care. Randall explained in her affidavit that she had discussed with Poplin the requirement of administering medication only with written parental authorization and that Poplin confirmed that she was compliant with the policy. Further, Poplin had a written operating policy for her home day care indicating that she administered medication only with written parental authorization.
Section E.2.d(2) of the Department's minimum standards requires that any prescription or over-the-counter drug to be administered to a child in day care be in its original container and be labeled appropriately with specific instructions for administering the drug and that a measuring device be provided if the medication requires measuring. Section E.2.d(3) requires that all medication in the home be kept in a locked cabinet or other container. Section E.2.d(4) requires that all medications be returned to the child's parent or guardian when no longer needed.
Randall marked the "Compliance" box on the child-care home-licensing evaluation form with an "S," indicating that Poplin had certified that she had a measuring device for administering medications and that medications were returned to parents or guardians when they were no longer needed. Randall indicated that Poplin was in violation of the requirement that all medications in the day-care home be kept in a locked cabinet or container by marking the "Non-compliance" box with a "D," indicating that she had discussed with Poplin the violation of this standard. Randall testified regarding her determinations as to the minimum standards as follows:
 "Q. Okay. You've got an S here under medicines returned to child's parent when no longer needed, and you've got an S there instead of a D?
 "A. Yes, sir.
 "Q. What did you do more than discuss that?
 "A. Ms. Poplin told me that she gave the medicine back, and we discussed that that was the procedure. We discussed that that was the procedure.
 "Q. Did not that send up a red flag that there were no medical authorizations if she told you that she was sending medicine back with the parents when they didn't need it any more?
 "A. Let me correct my statement. We discussed how — what the procedure was if she received medication, then the procedure was to give it back to the parent.
 "Q. And again, my —
 "A. And we discussed that.
 "Q. Okay. And again my question — there are 20 entries on this page under health all the way down through care of infants. There are 20 entries, and you've got D for every one of them except you certified in some method measuring device provided and you certified in some method medicines returned *Page 657 
to child's parent when no longer needed.
 "A. Yes, sir.
 "Q. So that was certified to you that medicines are returned to [a] child's parent when no longer needed?
 "A. If she has to use medication, yes, she is to return it to the parent.
 "Q. But she certified to you that she had been returning it to the parent?
 "A. That's not what that says.
 "Q. Well, tell me why it has an S and everything else on that page is a D except for the measuring device?
 "A. That was what was used. That was the — the code that was used for that particular.
 "Q. And I understand that's the code. It's obvious to me looking at it that that's the code that was used. But my question is you were the one that used it; why did you use that in that particular case instead of the D?
 "A. Because in discussing that, if I recall, she said if medicine is ever used, she returned it to the parent.
 "Q. Okay. You couldn't find any evidence from any of the records you reviewed that she'd ever given medicine, though, could you?
 "A. According to the form, that was not applicable.
 "Q. I understand, ma'am. But you were the one that filled out the form. So I need you to tell me what you found or didn't find, not what the form says because you filled out the form.
 "A. Okay. Had a form been there, then I would have noted that there was one.
 "Q. Okay. The medicines that you did see that you discussed with her that they should be locked, did you make any investigation to see if any of those medicines were in the name of anybody other than household members in that house-hold?
 "A. No, sir.
 ". . . .
 "Q. Since there were no forms filled out showing that parents had given authorization to give any children medicine, did you think it might be important to look at the medicines that were there in the house to see if any of them were in some name other than a household member and that they might have been for a child?
 "A. I did not look to see who the medicine was for.
 "Q. Okay.
 "A. There was medicine there, but I did not look to see whose name was on it.
 "Q. And my question is did you think that might be important to do?
 "A. We were not required to look.
 "Q. That was not your job; is that what you're saying when you say not required?
 "A. No, that's not what I said. We were not required to look at each medicine bottle to verify whose medicine it was because there was no form."
Section H.2. of the Department's minimum standards requires that a group-day-care home have at least the following care-givers: the licensee, an assistant caregiver, and at least two substitutes. Section H.3. provides that when seven or more children are present in the day-care home, "at least two (2) adult caregivers shall be present and supervising the children. This shall include the licensee and the assistant caregiver. If a substitute is used, either the licensee or the assistant caregiver shall be present and supervising the children." Section H.6. requires that an assistant caregiver receive at least 12 *Page 658 
hours of training in such areas as child development, health and safety, quality child care and licensing, language development, and positive discipline and guidance. The substitutes are not required to have any specialized training.
Dana Pope was Poplin's assistant care-giver. Clifton Poplin, Poplin's husband, and Margaret Hackney were listed as Poplin's substitutes in the operating policy for the day-care home. Pope worked in the group-day-care home from 7:30 a.m. to 5:30 p.m. She was primarily responsible for caring for the infants; Poplin cared primarily for the older children. Pope generally took a three-hour lunch break, which began at noon. During the hours of Pope's lunch break Clifton would come home from his outside employment to assist in the group-day-care home. Because Clifton was employed outside the group-day-care home,[4] Randall required Poplin to provide a letter from Clifton's employer stating that Clifton would be available to assist in the day-care home when needed. Although Randall knew that Clifton would be used as a substitute, she testified that she had no knowledge as to the extent to which Clifton would be used as a substitute. Nevertheless, Randall testified that if Clifton substituted for the assistant care-giver three hours a day five days a week, Poplin would not be violating the Department's minimum standards regarding the use of substitutes. She stated that there was no regulation regarding how often a substitute could be used by a licensee so long as either the licensee or the assistant caregiver is present while the substitute is being used.
Randall marked the "Compliance" boxes with a "D" on the "Child Care Home Licensing Evaluation" form, indicating that she had discussed with Poplin the requirements that at least two adults be present and supervising the children when seven or more children are present and that either the licensee or assistant caregiver must be present when a substitute is being used. However, Randall found that Poplin was not compliant with the requirement that certain records relating to the assistant caregiver be kept. She indicated that she discussed Poplin's noncompliance with this requirement by marking the "Non-Compliance" box with a "D."
Randall made a follow-up visit to Poplin's home on May 29, 2002. Poplin had at this time corrected the majority of the deficiencies found during the April 9, 2002, inspection and had so verified to Randall. The correction of the deficiencies was noted by Randall on the deficiency report.
Randall noted other deficiencies during the May 29, 2002, visit relating to certain records of Hackney and Clifton that Poplin was required to keep. Randall again completed a deficiency report. Poplin corrected these deficiencies by forwarding verification of these records to Randall, and Randall subsequently noted that the deficiencies on the May 29, 2002, deficiency report had been corrected. Randall then recommended to her supervisors that Poplin's home-day-care license be renewed. The Department renewed Poplin's home-day-care license on July 26, 2002.
The evidence presented at the hearing on Randall's summary-judgment motion revealed the following facts. Douglas was born on June 17, 2002. His parents, Robert and Mary Hernandez, contacted the Department to inquire about licensed home-day-care facilities and were provided a list. The parents selected Poplin's day *Page 659 
care, and Douglas began attending Poplin's home day care on August 12, 2002. On August 30, 2002, Robert took Douglas to Poplin's home day care and signed him in at 7:06 a.m. Douglas was sleeping and had recently been fed when he arrived. Douglas woke up approximately 20 minutes later. As was the normal routine, Poplin and Pope took the children outside for approximately 45 minutes to an hour before lunch. The children were then brought inside and fed.
Poplin testified that Douglas was fussy and that she administered some Tylenol brand acetaminophen to him after lunch. Poplin denies administering any other medication to Douglas. Douglas and the other infants were then put down for their naps, and Pope left the day care to begin her lunch break. Poplin testified that at 2:30 p.m. she heard Douglas cry out and she went into the nap room to check on him. She stated that she put Douglas's pacifier back in his mouth and remained with him until he went back to sleep. Poplin resumed other activities in the home but testified that she could hear Douglas and the infants in the nap room.
Poplin returned to the nap room shortly after 3:00 p.m. and saw that Douglas was blue and he was not breathing. Poplin called for Pope, who had just returned from her lunch break, to telephone emergency 911. As Pope telephoned 911, Poplin began performing CPR on Douglas. Douglas vomited several times as Poplin was performing CPR on him. The emergency personnel arrived and transported Douglas to the hospital, where he was pronounced dead at 3:50 p.m.
Dr. Leroy Riddick investigated Douglas's death for the Alabama Department of Forensic Sciences. An initial autopsy report issued on August 31, 2002, indicated that the cause of Douglas's death was "aspiration of a foreign material" and that the manner of death was "undetermined." Toxicology results issued on December 20, 2002, revealed the presence of dextromethorphan, chlorpheniramine, diphenhydramine, atropine, and metoclopramide in Douglas's blood. Dr. Riddick testified that dextromethorphan is a cough suppressant and that chlorpheniramine and diphenhydramine are common antihistamines found in over-the-counter cold medications. Atropine was used during resuscitative measures at the hospital, and metoclopramide is used to treat gastric reflux.
Dr. Riddick continued his investigation into Douglas's death and consulted other experts. On June 10, 2003, Dr. Riddick amended his original finding as to the cause of death to state the following:
 "Further study of and reflection on this case necessitates my putting `Acute Drug Toxicity" as a contributory cause of death and to indicate that, in my opinion, the aspiration was due to the depression of the central nervous system from the drug toxicity. Exactly when and how the infant received the drugs are investigative matters, which remain unclear to me. Thus, the manner [of death] remains undetermined."
Subsequently, Dr. Riddick performed additional tests on the material Douglas had vomited onto the shirt that he was wearing at the time of his death. The tests revealed the presence of the drug guaifenesin, a cough suppressant. Based on the results of these tests, Dr. Riddick, on September 9, 2003, changed his determination as to the manner of death to state the following:
 "The report of toxicological analysis of the shirt worn by the subject is attached. The presence of the drugs in the stains on the shirt from gastric contents and the high levels in the blood indicate that the infant had received the *Page 660 
drugs recently. The manner of death is, therefore, changed to Homicide."
Dr. Riddick testified as follows regarding his decision to change the manner of Douglas's death to homicide:
 "[T]he central question early on was when did this child receive these drugs. That was it. That was the reason — I wasn't certain. I knew the half-life of the drugs was really shorter than if the child had received the drugs prior to seven o'clock in the morning. This sort of clinched it. That sometime after seven o'clock in the morning, while the child was at the day-care center, [the child] received these drugs. My definition of a homicide is one or more people are responsible for another person's death. The child was not ill according to the parents and the investigation, and the child was not under a doctor's care, and these medications had not been prescribed by a physician."
Dr. Riddick opined that the drugs in Douglas's system had been administered to him after 7:00 a.m. on the date of his death. He testified that if the drugs had been administered before Douglas had arrived at the day care the toxicological tests would not have disclosed the presence of the drugs in Douglas's system because the drugs would have been absorbed and metabolized. Dr. Riddick further stated that if the drugs had been administered before Douglas had arrived at the day care he would have become nonresponsive or have had a central-nervous-system depression upon his arrival at the day care. Dr. Riddick testified that Douglas would have been in physical distress during the process of aspirating and dying. The evidence further indicated that from the point Douglas aspirated the liquid into his lungs to his death would have been 15 to 20 minutes.
The Hernandezes filed a formal complaint with the Department on September 3, 2002, alleging that Douglas had been left unsupervised for a lengthy period at Poplin's day care and that that had contributed to his death. The Department investigated the complaint on October 4, 2002, and concluded that the complaint was "not indicated for inadequate supervision." Randall was not involved with the investigation regarding the complaint.
Subsequently, a second formal complaint alleging that Poplin had administered medication to a child without parental authorization was filed with the Department. Randall returned to the Poplin home day care on February 11, 2003, to investigate the second complaint. Poplin admitted that she had administered Tylenol brand acetaminophen to Douglas without a medical authorization from his parents. Randall found the complaint to be substantiated and completed a licensing-complaint-investigation form. Randall again reviewed with Poplin the Department's regulation against administering medication to a child without written medical authorization from the child's parents. The Department instituted a corrective plan, and Poplin agreed not to administer medication to a child without having a medication-authorization form on file. Randall also noted additional violations of the minimum standards during the February 11, 2003, visit. She completed a deficiency form at that time. Randall followed up with another visit to Poplin's day care on February 27, 2003. She confirmed that the violations noted on February 11 had been corrected by Poplin.
Ultimately, once the Department learned that Dr. Riddick had reclassified the manner of Douglas's death as a homicide caused by acute drug toxicity, it took action to suspend and ultimately to revoke Poplin's home-day-care license. *Page 661 
The Hernandezes then filed their complaint, alleging wrongful death and fraud and seeking certain injunctive relief. Specifically, the complaint alleges that Randall failed to perform her ministerial duty and acted either negligently, willfully, illegally, or beyond her authority, or under a mistaken interpretation of the law when she: (1) failed to investigate Poplin's use of medication for children at the day care and falsely reported that she had investigated Poplin's use of medication; (2) failed to properly investigate whether the children were supervised at all times; (3) made a determination that supervising the children did not require that someone visually and/or audibly supervise the children; (4) failed to properly investigate Poplin's home day care at the time Poplin's day-care license was renewed; and (5) failed to advise and train Poplin to administer medication only after she had received written authorization from the child's parents. Regarding the fraud claim, the Hernandezes alleged that Randall: (1) entered notations on the licensing report that she knew or should have known were false; (2) falsely documented the evaluation of the Poplin home day care to indicate that Poplin was compliant in administering medication; and (3) misrepresented the findings of her licensing evaluation of Poplin's home day care, on which the Hernandezes relied to their detriment.
Randall moved for a summary judgment, asserting State-agent immunity as a defense. Following a hearing, the trial court, on October 20, 2007, entered an order denying Randall's summary-judgment motion and finding that a jury question was presented as to "whether or not defendant Randall followed proper departmental procedures regarding the evaluation forms for the day care" This petition followed.
 Standard of Review
This Court has stated:
 `"While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996). . . .
 "`Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981
(Ala. 1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
 "`An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278
(Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992).'"
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, *Page 662 791 So.2d 911, 912-13 (Ala. 2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner demonstrates: "`(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" Ex parte Nail, 879 So.2d 541, 543
(Ala. 2003) (quoting Ex parte BOC Group, Inc.,823 So.2d 1270, 1272 (Ala. 2001)).
 Discussion
In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), this Court restated the test for determining when a State employee is entitled to State-agent immunity:
 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "(1) formulating plans, policies, or designs; or
 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 "(a) making administrative adjudications;
 "(b) allocating resources;
 "(c) negotiating contracts;
 "(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
 "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." 792 So.2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court's decisions in Ex parte Rizk, 791 So.2d 911 (Ala. 2000), and Ex parte Butts, 775 So.2d 173 (Ala. 2000).
Additionally, this Court has stated:
 "This Court has established a `burden-shifting" process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, *Page 663 
in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). `A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."' Giambrone, 874 So.2d at 1052
(quoting Ex parte Butts, lib So.2d 173, 178 (Ala. 2000))."
Ex parte Estate of Reynolds, 946 So.2d 450, 452
(Ala. 2006).
Randall argues that in evaluating the Poplin home day care for license renewal she complied with state law and with departmental policy; therefore, she argues, she is entitled to State-agent immunity as a matter of law. The Hernandezes argue that Randall is not entitled to State-agent immunity because, they say, she acted fraudulently and under a mistaken interpretation of the Department's policy, rules, and regulations in evaluating the Poplin home day care for purposes of renewing Poplin's license.
 I. Randall's Alleged Failure to Require Written Medication-Authorization Forms
The Department's minimum standards require a home-day-care operator to obtain a written medication authorization from a child's parents before administering any medication to that child. The home-day-care operator is required by Department regulation to keep a copy of the written authorization in the child's records located at the day care for up to two years after the child leaves the day care. As required by law and the Department's regulations, Randall reviewed the records of the children in Poplin's care during her evaluation of Poplin's day care on April 9, 2002. Randall discovered during the review of the children's records that Poplin had no written medication-authorization forms on file. Rather than indicate that Poplin was noncompliant in failing to have any written medication-authorization forms, Randall indicated on the records checklist that this requirement was not applicable to Poplin. Randall explained that a written medication-authorization form was required to be in a child's records only if Poplin had administered medication to that child in the past. Randall's explanation of requiring a written medication-authorization form to be in a child's records only if Poplin had administered medication to the child is entirely consistent with the Department's policy against "blanket" authorization forms found in section E.2.d(1) of the Department's minimum standards.
Randall testified in her affidavit that she discussed with Poplin the Department's regulation that medication be administered to a child only after obtaining a written medication-authorization form from the child's parents and that Poplin assured her that she complied with that regulation. Randall indicated on the licensing-evaluation form that she had discussed with Poplin that regulation. Additionally, Randall confirmed that Poplin had a written operating policy for her home day care, as required by the Department, indicating that medication would be administered to a child only with written authorization from the child's parents.
The Hernandezes point to the facts that it is unlikely that Poplin had never had to administer medication to a child, that Poplin certified to Randall that she had a measuring device she used for administering medication, and that she certified to Randall that she returned medication to the parents when the medication was no longer needed, in support of their argument that Randall should have known that Poplin was administering medication to the *Page 664 
children in her care without first obtaining the written medication-authorization forms from the children's parents.
Randall's fault with regard to the matters forming the basis for this action is failing to probe more deeply to get to the truth. Of course, a reasonable person is not required to accept an improbable explanation in absence of proof to the contrary — a reasonable person should reject such an explanation. The parents, when the evidence is viewed, as it must be, in their favor, have assembled facts that could reasonably support the conclusion that Randall was either quite gullible or negligent or perhaps even reckless in accepting Poplin's statements at face value and completing the licensing-evaluation form based on those statements. But no evidence suggests that Randall was in collusion with Poplin or that she had some impermissible motive "to look the other way." Randall's failure to detect that Poplin must have been administering medication without proper documentation is consistent only with negligent or wanton behavior.
This Court has previously held that poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in Cranman.
See Giambrone, 874 So.2d at 1057 (holding that State-agent immunity "is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority").
The dissenting opinion appears to treat as exhaustive the list illustrating the basis of immunity in Cranman. This Court in Howard v. City of Atmore, 887 So.2d 201, 206
(Ala. 2003), rejected that notion by acknowledging that the list in Cranman was illustrative and not exhaustive. ("On its face, Cranman disclaims the rigidity, or exclusivity, attributed to it by Howard. In other words,Cranman states categories, but does not purport to set forth an exhaustive list of activities falling within each category.") Cranman is only a restatement; it is not a statute. Additionally, category (2) of Cranman refers to a State agent's "exercising his or her judgment in the administration of a department or agency of government,including, but not limited to, examples such as" and there follow certain specific activities. 792 So.2d at 405
(emphasis added). Thus, Randall cannot be faulted for her failure to identify in her petition an illustration that applies neatly to her situation.
Randall was charged by statute with duties necessary to the administration of the Department. Randall did not erroneously report an objective fact, such as whether a swimming pool was enclosed by a fence, as was the case in Phillips v.Thomas, 555 So.2d 81, 86 (Ala. 1989), in which immunity was denied. On the other hand, the ability to sift through false information in a way that elicits the truth is not on the same level of judgment in furtherance of a state activity analogous to electing between potholes while operating an automobile. SeeTown of Loxley v. Coleman, 720 So.2d 907 (Ala. 1998) (holding that steering a police vehicle around pot-holes does not involve the type of judgment to which immunity applies). A good case has been made that Randall exercised poor judgment in the discharge of duties imposed upon her by statute. However, these circumstances are insufficient to deprive her of State-agent immunity under Cranman. The dissent would deny immunity to a State agent who would have clearly been entitled to immunity before this Court's restatement ofCranman. *Page 665 
The Hernandezes have failed to present substantial evidence indicating that Randall acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority, or under a misinterpretation of the law in discharging her duties in completing the Department's licensing-evaluation form as it pertained to the Department's policy requiring day-care operators to obtain written medication-authorization forms before administering medication to children in their care.Reynolds, supra. Accordingly, we conclude that Randall is entitled to State-agent immunity as to all claims asserted by the Hernandezes arising out of the alleged failure to require the written medication-authorization forms.Cranman, supra.
II. Randall's Alleged Failure to Determine that the Children At Poplin's Day Care Were Improperly Supervised
The Hernandezes contend that Poplin's day care was continuously under-staffed and that Randall failed to detect this deficiency. Because Poplin operated a home day care, the Department's minimum standards required her to have, in addition to herself, an assistant caregiver and at least two substitutes on her staff. Randall confirmed that Pope was employed by Poplin as the assistant caregiver and that Clifton Poplin and Margaret Hackney were on staff as substitutes. Because Randall knew that Clifton was employed outside the day-care home, she required Poplin to provide a confirmation letter from Clifton's employer stating that Clifton would be available to assist in the day care when he was needed. Poplin's assistant caregiver and two substitutes were listed on the operating policy of the home day care. Accordingly, Poplin's home day care was appropriately staffed.
The Hernandezes further argue that had Randall done even a cursory investigation by speaking with Pope or Clifton she would have discovered that Pope was absent from the home day care for three hours a day, and she would therefore have been required to indicate Poplin's noncompliance with the Department's staffing regulation on the deficiency report. The Hernandezes argument assumes that Pope's absence from the home day care for three hours per day violated a Department regulation. Section H.3. of the Department's minimum standards required only that Poplin and the assistant caregiver be present and supervising the children when seven or more children were present. However, if Poplin chose to use a substitute, then the Department's minimum standards required that either Poplin or the assistant caregiver be present and supervising the children with the substitute. Randall testified that if Clifton was used as a substitute three hours a day for five days a week, Poplin would not be in violation of the Department's minimum standards regarding the use of substitutes. She further stated that there was no Department regulation regarding how often a substitute could be used by a licensee, so long as either the licensee or the assistant caregiver was present with the substitute. The Hernandezes have presented no evidence to the contrary.
Additionally, the Hernandezes have presented no Department regulation requiring Randall to confirm the work schedules of employees at the day care. All the licensing-evaluation form requires Randall to do in regard to staffing is to discuss with Poplin, to observe, or to certify that at least two adults are present and supervising the children when seven or more children are present and that either the licensee or assistant caregiver be present if a substitute is being used. Randall complied with the licensing-evaluation form by indicating *Page 666 
that she had discussed that requirement with Poplin.
We conclude that the Hernandezes have failed to present substantial evidence creating a question of fact as to whether Randall acted beyond her authority or under a misinterpretation of the law in discharging her duties of completing the Department's licensing-evaluation form as it pertained to the staffing and supervision requirements of the Department's minimum standards. Reynolds, supra. We further conclude that Randall is entitled to State-agent immunity as to all claims asserted by the Hernandezes arising out of the alleged failure to properly supervise. Cranman, supra.
 III. Randall's Alleged Fraudulent Misrepresentations in Completing the Licensing-Evaluation Form
The Hernandezes contend that Randall fraudulently completed the licensing-evaluation form and made fraudulent misrepresentations on the form about Poplin's compliance with the Department's minimum standards. In order to survive a summary judgment on a fraud claim, a plaintiff must present substantial evidence indicating that there was a genuine issue of material fact as to whether the defendant: (1) made a misrepresentation; (2) of a material existing fact; (3) upon which the plaintiff reasonably relied; (4) which proximately caused injury or damage to the plaintiff. Byrd v.Lamar, 846 So.2d 334 (Ala. 2002).
The Hernandezes specifically contend that "deficiencies existed that were never listed nor corrected because Randall did not perform the duties that she indicated on the evaluation form [that] she had performed." As discussed above, this Court has concluded that the Hernandezes have failed to present substantial evidence creating a question of fact as to whether Randall acted beyond her authority or under a misinterpretation of the law in discharging her duties when she evaluated Poplin's home day care for the purpose of renewing Poplin's license. Further, the Hernandezes have failed to present any evidence indicating that any deficiencies existed in the day care that were not properly identified by Randall and required to be corrected. Accordingly, we conclude that Randall made no misrepresentations in completing the licensing-evaluation form that could have been relied on by the Hernandezes, and the fraud claim therefore fails as a matter of law.
 Conclusion
Randall is entitled to State-agent immunity as to the claims asserted against her by the Hernandezes. Because she has demonstrated a clear legal right to the relief sought, we grant the petition and issue the writ of mandamus.
PETITION GRANTED; WRIT ISSUED.
LYONS, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
SEE, J., concurs specially.
COBB, C.J., and MURDOCK, J., dissent.
[1] Randall states in her petition that the trial court has dismissed the Department and the commissioner as defendants.
[2] Section 38-7-6(b), Ala. Code 1975, provides, in pertinent part:
 "(b) The department shall reexamine every child-care facility for renewal of license or approval, including in that process, but not limited to, the examination of the premises and records of the facility and the persons responsible for the care of children as the department considers necessary to determine that minimum standards for licensing or approval continue to be met. . . . If the department . . . is satisfied that the facility continues to meet and maintain minimum standards which the department prescribes and publishes, the department shall renew the license or approval to operate the facility "
[3] The Department prescribes numerous regulations in its "Minimum Standards for Family Day Care Homes" that a home-day-care provider must comply with in order to obtain or maintain licensing. See § 38-7-7, Ala. Code 1975. In order to ensure proper compliance with the Department's minimum standards, a licensing consultant is given an "Alabama Department of Human Resources Child Care Home Licensing Evaluation" form to be completed by the consultant during the home evaluations. The evaluation form lists the regulations that the home-day-care provider must comply with. Located adjacent to each regulation are three boxes that indicate "Compliance," "Non-compliance," and "Not Applicable." The licensing consultant completes the evaluation form by marking the appropriate box as it relates to the regulation with the code letters "O," "S," "D," and "X." "O" indicates that the licensing consultant observed compliance or noncompliance with the regulation. "S" indicates that the licensee certified compliance or noncompliance with the regulation. "D" indicates that the licensing consultant discussed compliance or noncompliance with the regulation with the licensee. "X" indicates that the regulation was not applicable or was not reviewed with the licensee. Randall testified that the codes "O," "S," "D," and "X" are "interchangeable" and that the decision to use an "O," "S," "D," or "X" in marking a box on the evaluation form is left to the discretion of the licensing consultant.
[4] Nothing in the Department's minimum standards prevents substitutes from being employed outside the group-day-care home.