In case no. 1090762, Gilnita Jones, Cynthia Pate Henderson, Elizabeth Katie Walter, and Tracy Eubanks petition this Court for a writ of mandamus directing the Jefferson Circuit Court to enter a summary judgment in their favor on the basis of State-agent immunity in a wrongful-death action brought against them by Angela S. Levert, as personal representative of the estate of M.S. In case no. 1090781, Tyshelle Wilson petitions this Court for a writ of mandamus directing the Jefferson Circuit Court to enter a summary judgment in her favor on the basis of State-agent immunity in the same wrongful-death action. We grant the petition as to Jones, Henderson, and Walter; we deny the petition as to Eubanks (case no. 1090762). We deny the petition as to Wilson (case no. 1090781).
 I. Facts and Procedural History
At the time of the events underlying this wrongful-death action, Wilson was a social worker with the Jefferson County Department of Human Resources ("DHR"). Among Wilson's duties at that time was to act periodically as an on-call DHR worker charged with responding to telephone calls made to DHR after normal business hours. On October 5, 2007, Wilson was the scheduled on-call worker responsible for investigating a call received by DHR alleging child abuse or neglect against a minor child, M.S., who was at that time approximately 23 months old. Levert, the child's grandmother, telephoned DHR at approximately 9:30 p.m. Jones, another *Page 477 
DHR worker, was assigned to "shadow" Wilson while Wilson investigated Levert's allegations. According to DHR, a shadow assignment is a training exercise for a worker before that worker assumes responsibility as an on-call worker. Jones testified that as a shadow worker she had no input into investigating a call. Before going to M.S.'s home, Jones spoke with Levert on the telephone. Wilson and Jones stated that Jones returned Levert's initial telephone call because Wilson was busy with another call involving a teenager received on the same evening. Levert described bruising on M.S.'s face and reported that a day-care worker who saw M.S. regularly reported to her that he had been walking with a limp. Levert reported to Jones that M.S.'s mother, L.S. ("the mother"), told her that she intended to take M.S. to the doctor, but Levert said that she did not believe that he had been taken to the doctor.
Wilson spoke with the on-call supervisor for the evening, Deborah Key, who advised her to go to the house and confirm that M.S. had been taken to the doctor. Wilson and Jones then went to the house, where they found M.S. in the care of the mother's boyfriend, Nakia McConico. M.S. was asleep on the couch; there were bruises on his forehead and around his eye. Wilson and Jones then traveled to the mother's place of employment to verify that M.S. had been seen by a doctor. The mother told Wilson and Jones that M.S. had fallen off his bicycle, that he had been taken to the hospital where he had seen a doctor on October 4 (the preceding day), and that the paperwork generated by the hospital visit was at the house. Wilson and the mother then returned to the mother's house, where the medical paperwork was located and given to Wilson. Jones did not accompany Wilson on her second visit to M.S.'s house. Wilson took the paper-work and returned to her office. Wilson telephoned Key, the on-call supervisor for the evening, and reported to her the information she had gathered, including the fact that the hospital physician who saw M.S. indicated that his injuries were consistent with a fall from a bicycle. Wilson advised Key that the investigation had been completed, that she was preparing a written report of the investigation, and that she would place the report, together with the hospital-discharge paperwork and the doctor's report, in the DHR intake supervisor's mailbox. Eubanks was the intake supervisor at that time. Wilson says that she prepared written reports of both the investigation of M.S.'s case and the investigation of the call involving the teenager, and that she placed both reports in Eubanks's box during the early morning hours of October 6 before the DHR office opened at 7:30 a.m. DHR intake logs and building logs show Wilson's arrival and departure from the building. However, Eubanks testified that she never saw Wilson's report on M.S.
Wilson thereafter had no further involvement in M.S.'s case. She did not hear anything further about M.S. until she was informed on October 21, 2007, that he had died on that date. It is undisputed that Wilson's report should have triggered assignment of the call to an intake worker to obtain more detailed facts surrounding Levert's call to DHR and, thereafter, assignment of the case to a child-abuse-and-neglect ("CA/N") worker to investigate more fully Levert's allegations of the alleged abuse. It is also undisputed that no intake worker or CA/N worker was assigned to M.S.'s case immediately after Wilson's initial contact with the family as the on-call worker. After M.S.'s death, Eubanks assigned Henderson, an intake worker in Jefferson County, to undertake the intake process concerning M.S.'s case and assigned Walter, a CA/N worker in *Page 478 
Jefferson County, to undertake the CA/N investigation.
On May 30, 2008, Levert sued Wilson, Jones, Henderson, Walter, Eubanks, and numerous other DHR workers.[1] Levert sued each DHR worker in her individual capacity, alleging that she had negligently failed to perform her mandatory duties in accordance with DHR's rules and regulations, as well as the laws of the State. The complaint also alleged that each DHR worker had acted willfully, maliciously, fraudulently, in bad faith, beyond her authority, or under a mistaken interpretation of the law, proximately causing M.S.'s death. Expert testimony indicates that M.S. died from injuries inflicted during the evening of October 20-21 and not from any injuries relating to the October 4 incident investigated by Wilson and Jones. McConico has been arrested and charged with capital murder in connection with M.S.'s death.
Levert contended in the trial court that Wilson and Jones neither completed an investigatory report nor turned it in to Eubanks, who has stated that she "did not see [the report]." Levert also contended that Eubanks failed to make a timely assignment of an intake worker and a CA/N worker to M.S.'s case and that Henderson and Walter, who were assigned to the case after M.S.'s death, failed to complete timely investigations. Levert further contends that any investigation DHR conducted would have, or should have, uncovered the facts that McConico, who was reported to be a drug user and drug dealer who had also been previously charged with child abuse, was alone with M.S. for 12 or more hours a day and that both the mother and McConico were addicted to cocaine, heroin, marijuana, ecstacy, and other drugs.
Wilson, Jones, Henderson, Walter, and Eubanks all filed motions for a summary judgment arguing that they were immune from liability on the basis of State-agent immunity. Levert contended that, by their willful deviations from DHR policy, Wilson, Jones, Henderson, Walter, and Eubanks waived any State-agent immunity they may have otherwise had. On January 26, 2010, the trial court denied their motions for a summary judgment, and they petitioned for writs of mandamus.
 II. Standard of Review
"This Court has stated:
 "`"While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996). . . .
 "` "Summary judgment is appropriate only when `there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 *Page 479 
(Ala. 1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
 "` "An appellate court reviewing a ruling on a motion for summary judgment will, de. novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278
(Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rome v. Isbell, 599 So.2d 35 (Ala. 1992)."`
 "Ex parte Turner, 840 So.2d 132, 135
(Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: ` "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court."` Ex parte Nail, 879 So.2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001))."
Ex parte Yancey, 8 So.3d 299, 303-04 (Ala. 2008).
 III. Analysis "In Ex parte Cranman, 792 So.2d 392
(Ala. 2000), a plurality of this Court re-stated the test for determining when a State employee is entitled to State-agent immunity:
 "`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "`(1) formulating plans, policies, or designs; or
 "`(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 "`(a) making administrative adjudications;
 "`(b) allocating resources;
 "`(c) negotiating contracts;
 "`(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "`(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "`(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
 "`(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "`Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "`(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "`(2) when the State agent acts willfully, maliciously, fraudulently, in *Page 480 
bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'
 "792 So.2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court in Ex parte Rizk, 791 So.2d 911
(Ala. 2000), and Ex parte Butts, 775 So.2d 173
(Ala. 2000).
 "Additionally, this Court has stated:
 "`This Court has established a "burden-shifting" process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). "A State agent acts beyond authority and is therefore not immune when he or she `fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" Giambrone, 874 So.2d at 1052
(quoting Ex parte Butts, 775 So.2d 173, 178
(Ala. 2000)).'
 "Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006)."
Ex parte Yancey, 8 So.3d at 304-05.
 A. Case No. 1090762 1. Gilnita Jones
Jones argues that as a "shadow worker" she was assigned to assist Wilson on the calls Wilson received during her on-call assignment and to observe the on-call process but that she had no other responsibilities. Levert argues that as an employee of DHR Jones was considered a child-welfare staff worker just as Wilson was and that she had the same duty as did Wilson to turn in her on-call reports before 7:30 a.m. on the next business day. The trial court found that Levert presented substantial evidence that Jones had responsibilities beyond merely observing Wilson and that she also had a duty to turn in an on-call report. Because the trial court found that a factual dispute existed involving whether Jones had any involvement with the report and whether the report was properly submitted, it concluded that Jones was not entitled to a summary judgment on the basis of State-agent immunity. We disagree.
Jones and various DHR supervisory personnel all testified that a "shadow worker" was assigned to observe another worker performing a certain task as a type of training exercise and that a shadow worker did not have the same responsibilities as did the worker who was being observed. The only testimony Levert produced to indicate that Jones had a duty to turn in the same report as did Wilson was Wilson's statement that she thought Jones would have had the same duties she did and the statement by Levert's expert witness, a former DHR employee, that any child-welfare staff worker had a duty to follow all DHR policy, including the policy that all on-call reports were to be turned in before the beginning of the next business day. This testimony ignores the fact that Jones shadowed Wilson only as far as Wilson's interview with the mother at her workplace. Both Jones and Wilson testified that at that point Wilson told Jones she could go home and that Jones neither *Page 481 
accompanied Wilson and the mother back to the mother's house to retrieve the hospital records nor accompanied Wilson back to the DHR office to prepare and to turn in the on-call report. Wilson undertook the preparation of the on-call report by herself; Jones did not assist in its preparation or undertake to turn the report in to Eubanks. Jones clearly had no involvement in the point of dispute in this case — whether a report of the on-call investigation of M.S. was turned in to the supervisor who would have been responsible for assigning other workers to further investigate the incident upon receipt of the report. By that time, Wilson had terminated Jones's association with the investigation.
Jones demonstrated that Levert's claims arise from a function that would entitle her to State-agent immunity, i.e., "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner. . . ."Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000). Levert failed to prove that Jones acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority so as not to be entitled to State-agent immunity. We conclude that no genuine issue of material fact exists as to Jones's entitlement to State-agent immunity; therefore, her petition for a writ of mandamus is due to be granted.
 2. Cynthia Pate Henderson and Elizabeth Katie Walter
Both Henderson and Walter testified that they were not aware of the anything relating to M.S.'s case until they were assigned to investigate it as the in-take worker and the CA/N worker, respectively, following M.S.'s death. They both argue that they were complete strangers to the events made the basis of Levert's complaint and that their involvement with the case after M.S.'s death cannot be a basis for any liability arising from any failure to properly investigate the case after Levert's initial call to DHR. Levert argues that because Henderson and Walter were employees of DHR, each of them was considered a child-welfare staff worker who had the duty to respond to reports of suspected child abuse in accordance with DHR policy. The trial court found that Levert presented substantial evidence that if Wilson's report had been properly submitted, then Henderson and Walter should have known about M.S. before his death and that each of them had a duty to act on M.S.'s case pursuant to the dead-lines established by DHR policy. Because the trial court found that whether Henderson and Walter received Wilson's report and whether each knew about M.S. before his death were questions of fact to be decided by a jury, it concluded that Henderson and Walter were not entitled to State-agent immunity. We disagree.
Eubanks contends that because she never saw Wilson's report she cannot be held responsible for failing to assign an intake worker and a CA/N worker to investigate Levert's allegations of abuse before M.S.'s death. Consequently, it is undisputed that she made no such assignment before M.S.'s death. Henderson testified that Eubanks assigned her to complete the in-take process on M.S. after he had died and that she had never heard of M.S. before that time. Henderson further testified that Eubanks gave her notes that she was told had been written by Wilson and that Eubanks instructed her to enter those notes into her intake report. Henderson said she did as instructed, although she had not seen the notes before M.S.'s death and she never saw the report Wilson said she turned in to Eubanks. *Page 482 
Walter testified that Eubanks assigned her to complete the CA/N investigation on M.S. after he had died and that she had never heard of M.S. before that time. Walter also testified that Eubanks gave her notes that she was told had been written by Wilson and that Eubanks instructed her to enter those notes into her CA/N investigation report. Like Henderson, Walter said she did as she had been instructed, although she had not seen the notes before M.S.'s death and she never saw the report Wilson said she turned in to Eubanks.
The only testimony Levert produced to indicate that Henderson or Walter had a duty to M.S. before his death was the statements by Levert's expert witness that any child-welfare staff worker had a duty to follow all DHR policy, including the policy that intake and CA/N reports were to be completed within a specified period. This testimony assumed that Wilson's report had been properly turned in and acted upon and ignores the factual dispute that surrounds that report; it also assumes that assignments to Henderson and Walter preceded M.S.'s death, contrary to the undisputed evidence. Both Henderson and Walter testified that they had no knowledge about M.S. or the report of alleged abuse until after M.S.'s death, when they were assigned to be workers on his case. Clearly, Henderson and Walter were both complete strangers to any investigation of M.S. before his death.
Both Henderson and Walter demonstrated that Levert's claims arise from a function that would entitle each of them to State-agent immunity, i.e., "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner. . . ." Cranman, 792 So.2d at 405. Levert failed to prove that either Henderson or Walter acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority so as not to be entitled to State-agent immunity. We conclude that no genuine issue of material fact exists as to Henderson's or Walter's entitlement to State-agent immunity; therefore, their petitions for a writ of mandamus are due to be granted.
 3. Tracy Eubanks
As previously noted, Eubanks insists that she never saw Wilson's on-call report; therefore, she argues, she cannot be held responsible for failing to assign an intake worker and a CA/N worker before M.S.'s death to investigate Levert's allegations of abuse. Eubanks does not contend that Wilson did not turn in the report, only that she never saw it. Levert argues that Eubanks mishandled the assignments she was obligated to make upon receipt of the report and also argues that, as a supervisory employee of DHR, Eubanks was also considered to be a child-welfare staff worker who had the responsibility to assure that investigatory reports were completed within the periods specified by DHR policy. The trial court found that Levert presented substantial evidence that Eubanks had the supervisory responsibility of assigning workers to M.S.'s case upon the proper receipt of an on-call report and also that Eubanks had the same duties as any other child-welfare staff worker to follow DHR policy. As with Henderson and Walter, Eubanks's duty to follow DHR policy assumed that Wilson properly turned in her report and that Eubanks received it. Because the trial court found a factual dispute involving whether the report was properly submitted and/or received, it concluded that Eubanks was not entitled to a summary judgment based on State-agent immunity. We agree. *Page 483 
Wilson adamantly insists that she turned in her on-call report concerning her initial investigation of Levert's report of alleged abuse of M.S.; Eubanks just as adamantly insists that she never saw the report. This discrepancy clearly presents a genuine issue of material fact. Wilson testified that she placed her report on the teenager whose case she investigatedand her report on the investigation of M.S. in Eubanks's inbox before she left the DHR office shortly before 2:00 a.m. on October 5. She stated that she clipped the two reports together before she placed them into the box. Wilson said she knew that the teenager's case had been properly further investigated based upon her initial report and that she did not understand why Eubanks had not received her report on M.S. as well. If the jury believes Wilson and disbelieves Eubanks, the jury could conclude that Wilson did turn in the report and that Eubanks misplaced or mishandled it after Wilson turned it in. Furthermore, both Henderson and Walter testified that Eubanks instructed them to enter notes from Wilson into the reports they were completing after M.S.'s death. From that testimony, the jury could conclude that Eubanks had not only Wilson's notes before M.S.'s death, but also Wilson's report. Such factual disputes cannot be resolved at the summary-judgment stage of the proceedings.
Eubanks demonstrated that Levert's claims arise from a function that would entitle her to State-agent immunity, i.e.,
 "(2) exercising . . . her judgment in the administration of a department or agency of government, including . . . examples such as:
 . . . .
 "(d) . . ., assigning, or supervising personnel; or
 "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner. . . ."
Cranman, 792 So.2d at 405. Levert, however, produced testimony that, if believed, would prove that Eubanks acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority in failing to properly act on Wilson's report, thus satisfying her burden of proof under Giambrone v.Douglas, 874 So.2d 1046, 1052 (Ala. 2003). We conclude that a genuine issue of material fact exists as to whether Eubanks is entitled to State-agent immunity; therefore, her petition for a writ of mandamus is due to be denied.
 B. Case No. 1090781 — Tyshelle Wilson
Wilson maintains that she placed her report of her on-call investigation of Levert's allegations concerning M.S. in Eubanks's box in her office where such reports were to be placed; therefore, she argues, she cannot be held responsible for the failure of other DHR workers to investigate Levert's report of the alleged abuse of her grandson before M.S.'s death. Wilson consistently testified that she prepared and turned in the report during the early morning hours after she had visited the mother's house and had obtained the copies of the records relating to M.S.'s hospital visit and that her responsibility ended there. She stated that if Eubanks did not see the report, she does not know what happened to it. Levert argues that Wilson had a duty to turn in her on-call report before 7:30 a.m. on the business day next following the completion of the report. Because the trial court found a factual dispute involving whether the report had been properly submitted, it concluded that Wilson was not entitled to State-agent immunity. We agree. *Page 484 
As previously discussed, Wilson adamantly testified that she turned in her on-call report concerning her initial investigation of Levert's report of alleged abuse of M.S.; Eubanks just as adamantly testified that she never saw the report. This discrepancy clearly presents a genuine issue of material fact. If the jury believes Wilson's testimony that she turned in the report on M.S. with her report on the teenager whose case she also handled while on call on the night of October 5, 2007, and disbelieves Eubanks, the jury could conclude that Wilson turned in the report and that Eubanks was responsible for the failure to further investigate that followed. Likewise, as previously noted, testimony from Henderson and Walter indicating that Eubanks instructed them to enter Wilson's notes into their reports after M.S.'s death supports an inference that Wilson had turned in the report and that Eubanks misplaced or mishandled it. However, if the jury believes Eubanks's testimony that she never saw Wilson's report and, thus, never had any reason to know that further investigation into Levert's allegations was necessary, the jury could conclude that Wilson's failure to turn in her report or her mishandling of the report in the process of turning it in resulted in the failure to further investigate Levert's allegations of abuse. We reiterate that such factual disputes cannot be resolved at the summary-judgment stage of the proceedings.
Wilson demonstrated that Levert's claims arise from a function that would entitle her to State-agent immunity, i.e., "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner. . . ."Cranman, 792 So.2d at 405. Levert, however, produced testimony that, if believed, would prove that Wilson acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority in failing to properly turn in her report, thus satisfying her burden of proof under Giambrone,874 So.2d at 1052. We conclude that a genuine issue of material fact exists as to Wilson's entitlement to State-agent immunity; therefore, her petition for a writ of mandamus is due to be denied.
 IV. Conclusion
In case no. 1090762, we conclude that Jones, Henderson, and Walter are entitled to State-agent immunity, and we grant the petition as to them; we deny the petition as to Eubanks's claim that she is entitled to State-agent immunity. In case no. 1090781, we deny the petition as to Wilson's claim that she is entitled to State-agent immunity.
1090762 — PETITION GRANTED AS TO JONES, HENDERSON, AND WALTER AND DENIED AS TO EUBANKS; WRIT ISSUED.
1090781 — PETITION DENIED.
COBB, C.J., and STUART, BOLIN, and MURDOCK, JJ., concur.
[1] The other DHR workers Levert sued were Janice King, Toni Dollar, Angela Lacy McClintock, Catherine Denard, Terry Beasley, Renecia Swoopes, and Deborah Key. The trial court entered summary judgments in their favor; Levert has not appealed from those judgments.