BOLIN, Justice.
Yolanda Terry, a social worker employed by the Macon County Department of Human Resources ("DHR"), petitions this Court for a writ of mandamus directing the Macon Circuit Court to vacate its order denying her motion for a summary judgment based on State-agent immunity and to enter a summary judgment in her favor based on that defense. We grant the petition.
Facts
Mildred P. Collins, who was 85 years old at the time of her death on October 9, 2011, lived with her daughter Cherri Forrester, who was her legal guardian; Collins had suffered from Alzheimer's disease since approximately 2005.[1] On September 30, 2011, Ronald Person, Collins's grandson, contacted DHR and reported that Forrester had been physically abusing Collins. On Thursday, October 6, 2011, DHR assigned the case to Terry. At approximately 10:00 a.m. on that same day, Terry attempted to make an unannounced investigative visit to Forrester's home. According to Terry's case-file memo, Forrester came to the door in her pajamas; she seemed agitated by Terry's visit; and she requested that Terry return the following day, explaining that neither she nor Collins was dressed and that they had not eaten breakfast. The case-file memo further indicates that Terry "did not feel threatened or influenced by Ms. Forrester's demeanor to come back the next day." Following the attempted unannounced visit, Terry returned to her office, at which time she contacted Person concerning the allegations of abuse. Terry indicated in her case-file memo the following concerning her conversation with Person:
"On 10/06/2011, [Terry] returned to the office and made a phone call to Mr. Person being that he was the reporter. Mr. Person began explaining the history behind the allegations in his report to *1128 the agency. Mr. Person revealed to [Terry] that he had some pictures of his grandmother with bruises to her face. When asked, Mr. Person could not recall the specific time and day that the pictures were taken. Based on the conversation, it seemed that the pictures had been taken 2 weeks prior, as Mr. Person referenced the time frame when he, his daughter, and mother had just moved out of the home with Ms. Forrester and his grandmother in Montgomery at the request of Ms. Forrester. Mr. Person agreed to e-mail some pictures to [Terry]. After several attempts, Mr. Person was not successful in his attempt to send the pictures of his grandmother with bruises to her face due [to] the formatting in his cell phone. Mr. Person stated that he was driving and that the pictures were in his cell phone. He stated that he would send them that night when he was able to send them from a computer instead of his cell phone. [Terry] was unable to view the pictures on 10/06/2011 as [Terry] had left for day. During the conversation, [Terry] also received information regarding [Collins] being tied with pantyhose and threatened with a gun. Mr. Person also reported that he hid a tape recorder at the home one night. Mr. Person stated that the next day when he retrieved the tape recorder and played it back he could hear the sounds of someone being hit. [Terry] did not hear the tape recording."
Person testified in his deposition that he also had informed Terry that Forrester had mental-health issues and suggested that she take law enforcement with her on her next visit to Forrester's home.
On Friday, October 7, 2011, Terry returned to Forrester's home for an investigative visit, which, according to Terry, lasted approximately one hour; Terry was accompanied by Catherine Stakely, a DHR social worker. The materials before us indicate the following concerning the October 7, 2011, visit: When Terry and Stakely arrived at Forrester's home, Collins was neatly dressed and well groomed; Collins appeared to show no signs of physical abuse but had a mark on her forearm that appeared to be a birthmark or some type of "skin-on-skin" contact mark; Terry did not interview Collins alone because Collins was not oriented to person, place, or time; Stakely discussed with Forrester receiving home-health services for Collins to provide Forrester some relief as a caregiver; Forrester denied the allegations of abuse; Forrester expressed her frustration with family members because they were always telephoning DHR; Terry observed no aggression on Forrester's part toward Collins during the visit; Forrester indicated that she had been in the military and that she was receiving services through the Department of Veterans Affairs; and Forrester signed a "Department of Human Resources HIPPA Privacy Authorization" permitting DHR to contact the Department of Veterans Affairs. Following the October 7, 2011, investigative visit, Terry met with her supervisor, TaRhonda Wiggins, to discuss the visit. As a result of her meeting with Wiggins, Terry agreed that, when she returned to work the following week, she would continue her investigation by conducting a follow-up visit with Forrester and Collins, conducting additional interviews with collaterals who reportedly had witnessed Forrester's maltreatment of Collins, and contacting the Department of Veterans Affairs concerning Forrester. Terry testified in her deposition that, based on her observations of both Forrester and Collins on October 7, 2011, she determined that Collins was not in imminent danger, and there was no indication that legal intervention was needed at that time to have Collins immediately removed from Forrester's home. Collins died two *1129 days later on Sunday, October 9, 2011. The evidence before us is conflicting concerning the cause of Collins's death; however, the death certificate indicates "blunt force abdominal injuries with hematoma."
On June 22, 2012, Homer Lee Washington, the personal representative of Collins's estate, sued Terry, in her individual capacity, among others, seeking monetary damages. The gist of Washington's complaint is that Terry violated DHR policy and procedures by failing to properly investigate the report of the alleged abuse of Collins by Forrester and, more specifically, by allowing Collins to remain in Forrester's custody.
On June 24, 2016, following extensive discovery, Terry moved for a summary judgment, asserting State-agent immunity as a defense. Washington filed an opposition to the summary-judgment motion on July 8, 2016. Following a hearing, the circuit court, on September 29, 2016, entered an order denying Terry's summary-judgment motion. This petition followed.
Standard of Review
A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: " '(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.' " Ex parte Nall, 879 So.2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Grp., Inc., 823 So.2d 1270, 1272 (Ala. 2001) ).
" 'While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
" 'Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991) ; will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala. 1992) ; and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
" 'An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992).' "
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000) ).
Discussion
Although of relatively recent origin as precedent, this Court has had occasion in numerous matters to apply the test restated in Ex parte Cranman, 792 So.2d 392 (Ala. 2000), for determining when a State agent sued in his or her individual capacity is entitled to State-agent immunity:
*1130 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405 (some emphasis added). Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court in Ex parte Butts, 775 So.2d 173 (Ala. 2000).
Additionally,
"[t]his Court has established a 'burden-shifting' process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052 ; Ex parte Wood, 852 So.2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052 ; Wood, 852 So.2d at 709 ; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). 'A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." ' Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000) )."
Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006).
Terry asserts in her petition, and we agree, that, as a social worker with DHR, *1131 she is entitled to State-agent immunity under category (3) of the Cranman restatement because, she says, the actions for which she is being sued involve her discharging duties pursuant to DHR policy and procedures. Accordingly, Terry asserts, the burden shifted to Washington to show that, in investigating the reported allegations of abuse against Collins, Terry acted "willfully, maliciously, fraudulently, in bad faith, or beyond ... her authority." Ex parte Estate of Reynolds, supra. Washington asserts that Terry is not entitled to State-agent immunity because, he says, Terry acted beyond her authority by failing to comply with specific DHR policy and procedures concerning investigations of adults in need of protection. Specifically, Washington states that he offered substantial evidence to that effect through his expert, Alicia VanBuskirk, an Oklahoma registered nurse, who opined that Terry violated DHR policy and procedures by failing to complete an unannounced investigative visit to Forrester's home; by failing to notify law enforcement after being denied access to Forrester's home on October 6, 2011; by failing to interview Collins outside the presence of Forrester; and by failing to inspect all affected areas of Collins's body. Accordingly, the only issue for this Court's review is whether Washington presented substantial evidence, through his expert, establishing that Terry acted beyond her authority by allegedly failing to investigate the reported allegations of abuse against Collins pursuant to DHR policy and procedures so as to preclude Terry from being entitled to State-agent immunity.
DHR's "procedures of investigations and dispositions" state that the purpose of an investigation to determine whether an adult is in need of protection is "to establish facts that will be useful in determining whether the reported victim has been abused, neglected, or exploited" and "to secure sufficient information to determine what, if any, interventions are required by [DHR], whether to seek court action, and, to reach a disposition for each allegation and each person allegedly responsible." DHR policy and procedures concerning investigations of adults in need of protection state, in relevant part:
"All adults in need of protection who are the subject of abuse/neglect/exploitation reports must be seen and interviewed within seven calendar days of receipt of the report. Document any unusual circumstances that prevent seeing the person allegedly abused, neglected, or exploited. Unannounced investigative visits must be made to get the full picture of the home and the situation of the victim. There will be very limited circumstances when the worker's supervisor directs the worker to make an appointment. In most cases, a private interview is essential. The worker must discuss with the client each allegation that is part of the protective service report. ... Whenever possible, when the person allegedly responsible is a member of the household, the worker should arrange to observe the interaction between the client and that person after the individual interview.
"Where allegations of physical abuse are made, the worker will need to personally observe the affected areas (i.e. if allegation states bedsores on back, worker should observe this area). This must be done with the client's permission and preferably in the presence of another person. ...
"If there are allegations of neglect and/or self-neglect reported, the worker will need to observe for signs of deprivation of food, clothing, medications, or medical care. Supplies of food and medications should be checked as well as the condition of the victim's home including *1132 the kitchen, bathroom, and client's bedroom. Hazardous and unsanitary housing conditions, and improper or lack of supervision are also signs of neglect. ...
"....
"If the alleged victim refuses to talk to the worker or to allow access to the home, a systematic method should be used to gain acceptance. It is important to continue to seek entry by showing compassion and understanding to the client or caregiver who may feel threatened by 'someone from the State.' ... The worker must not force his/her way into a home and place his/her safety in jeopardy. Difficulties encountered in gaining access to the client and all efforts made to interview the client and observe his/her condition/situation must be carefully documented and fully detailed in the narrative.
"In some instances, the alleged victim may refuse to discuss the allegations with the worker. The client may be unable to communicate or may make a conscious decision not to do so because of fear, shame, or a sense of failure and uncertainty. The worker should continue with the investigation unless it appears that immediate court action for treatment, evaluation, or placement should be taken.
"....
"If a worker is denied access to the client because a caregiver or other person refuses to permit contact by the worker or because of locked doors, assistance should be requested from law enforcement officials. According to Code of Alabama 1975, Section 13A-10-2, obstructing government operations by means of intimidation, physical force, or interference where a person intentionally prevents a public servant from performing a government function is a Class A criminal misdemeanor. A petition must be filed in circuit court to gain access to the client to complete the investigation if all other strategies fail."
(DHR000184-000187.) (Some emphasis added.) DHR policy and procedures also state:
"It is likely that the worker may still need to do further work to complete the investigation, such as interview a collateral witness, obtain medical or psychological evaluation, secure bank records, etc., after the seven day period. However, all investigations should be completed, recorded and approved by a supervisor within 60 calendar days of the date the report is received by [DHR]. ..."
(DHR000203.)
1. Terry's compliance with DHR policy and procedures concerning unannounced investigative visits
Washington's expert, VanBuskirk, opined that Terry violated DHR policy and procedures by failing to make an unannounced investigative visit to Forrester's home because, according to VanBuskirk, the first step to any investigation involves an unannounced visit. VanBuskirk's opinion, however, is contrary to the plain language of DHR policy and procedures concerning unannounced investigative visits. DHR policy and procedures specifically state that "[u]nannounced investigative visits must be made to get the full picture of the home and the situation of the victim." (Emphasis added.) Pursuant to DHR policy and procedures, Terry had 7 days from the date DHR received the report of allegations of abuse to see and to interview Collins, and she had 60 days from the date DHR received the report of allegations of abuse to complete her investigation. DHR policy and procedures do not state at what point during this 60-day investigative period any unannounced visits have to be made, nor do *1133 they state that the initial investigative visit must be unannounced. Terry's supervisor, TaRhonda Wiggins, testified in her deposition that an unannounced visit has to be completed at some point within the 60-day investigative period. Here, the case was assigned to Terry on Thursday, October 6, 2011, and on that same day Terry attempted an unannounced visit-but was requested by Forrester to return the following day. On October 7, 2011, Terry returned to Forrester's home to see and to interview Collins, as well as Forrester. Thereafter, Wiggins advised Terry to follow up with neighbors and collateral contacts and to make an unannounced visit the following week. However, Terry was unable to conduct an unannounced visit the following week because Collins died on Sunday, October 9, 2011. Because DHR policy and procedures did not require Terry's initial investigative visit to be unannounced, Washington has failed to establish, through his expert, that Terry is not entitled to State-agent immunity.
2. Terry's compliance with DHR policy and procedures concerning the assistance of law enforcement
VanBuskirk opined that Terry violated DHR policy and procedures by failing to contact law enforcement after she was refused entry into Forrester's home on October 6, 2011-the date Terry attempted an unannounced visit. VanBuskirk stated in her deposition that, when Forrester refused to let Terry into her home at the time of the unannounced visit, Terry "definitely" should have notified law enforcement. DHR policy and procedures concerning access to a home state that, if a client, or in this case, the caregiver, "refuses to talk to the worker or to allow access to the home, a systematic method should be used to gain acceptance"; that "[i]t is important to continue to seek entry by showing compassion and understanding to the client or caregiver who may feel threatened by 'someone from the State' "; and that "[t]he worker must not force his/her way into a home and place his/her safety in jeopardy." In this case, Terry reported in her case-file memo that, when she arrived unannounced at Forrester's home on October 6, 2011, she agreed, at Forrester's request, to return the following day based on the fact that Forrester had come to the door in her pajamas and indicated that neither she nor Collins were dressed and that they had not eaten breakfast. Terry further reported in her case-file memo that "she did not feel threatened or influenced by Ms. Forrester's demeanor to come back the next day." This evidence demonstrates that Terry complied with DHR policy and procedures by showing Forrester, the caregiver, compassion and understanding by agreeing to return the following day and by not forcing herself into Forrester's home. Finally, the relative portion of DHR policy and procedures concerning assistance from law enforcement states that "[i]f a worker is denied access to the client because a caregiver ... refuses to permit contact by the worker or because of locked doors, assistance should be requested from law enforcement officials." (Emphasis added.) When questioned by Williams's counsel, Stakely, Terry's coworker, testified at length concerning DHR policy and procedures on this subject:
"Q. And what would prompt you to call law enforcement?
"A. If the worker is in danger-is at risk of being in danger or the individual that we are going to see.
"Q. Okay. What about if a worker has been denied access to an adult in need of services, is that a reason to call law enforcement?
"A. It would depend on the situation, because you may go back another day *1134 and not receive the same response from family members.
"Q. Okay.
"A. Because sometimes law enforcement will escalate a situation.
"....
"Q. And I just want to ask you, before we get into the policy, what would you consider access being denied?
"A. I would think that if I went to a home and I was informed that I was not going to be able to come into to the home and no matter who I brought, be it law enforcement or whomever, that would be denial of access to the home.
"Q. Does it have to be you are not coming in my home ever or you are not coming into my home today, or does it have to be a time limit on that denial to count as a denial of access?
"A. If the person informed me that I was not going to be able to enter the home and they were not going to allow me to come into the home, I would think of that as denial."
In this case, Forrester never denied Terry access to Collins; rather, Forrester requested that Terry return the following day, October 7, 2011, and Terry agreed. Stakely testified that if presented with these same circumstances she, too, would not have contacted law enforcement. Based on the foregoing, we conclude that DHR policy and procedures did not require Terry, under the facts indicated, to contact law enforcement. Accordingly, Washington failed to establish, through his expert, that Terry is not entitled to State-agent immunity.
3. Terry's compliance with DHR policy and procedures concerning private interviews
VanBuskirk opined that Terry violated DHR policy and procedures by failing to provide Collins an opportunity to be interviewed privately during which time Terry could have assessed Collins's mental condition. When questioned by Terry's counsel, VanBuskirk testified:
"Q. Did you read ... where Ms. Terry was interviewing [Collins] and ... her narrative indicates that [Collins] was not-she could not communicate.
"....
"A. [Terry] never interviewed [Collins] or was able to get into the home on the unannounced visit that was required, but on the announced visit she went in, and immediately ... started interviewing with [Collins] in the presence of the alleged perpetrator [Forrester]. Now, per policy [Terry] is supposed to give a private interview [during which time Terry] must discuss with [Collins] each allegation. Now, [Terry] may have at that time when she went in to do that private interview, decided that [Collins] was disoriented, but [Terry] never gave [Collins] an opportunity for that private interview. [Terry] immediately went in and did the interview with [Collins and Forrester] together.
"....
"Q.... [W]hat aspect of your education and training qualifies you to make that particular opinion?
"A. Because in my forensic nursing if there has been a report of any type of violence or abuse to a victim by an alleged perpetrator, and that perpetrator is in the home, it is very important that you interview that client separately to get their opinion on it before that perpetrator can coerce them, do any type of undue influence to them, any type of threats. So when you have the report that came in like we did on Ms. Collins, to keep them from being at risk of further threat or injury, it's important to *1135 speak with them so that you get their side of the story first."
(Emphasis added.)
In other words, VanBuskirk opined that, regardless of Terry's personal observation that Collins was not oriented to person, place, or time, and despite Collins's documented Alzheimer's disease, DHR policy and procedures required Terry to provide Collins an opportunity to be interviewed privately. According to VanBuskirk, Collins still had some ability to communicate and had some orientation as to person because she recognized Stakely.[2] DHR policy and procedures, however, specifically state that a private interview is essential "in most cases"; it does not state such an interview is essential in all cases. (Emphasis added.) The materials before us indicate that, during the investigative visit, Forrester presented Terry with paperwork showing that she was Collins's legal guardian because Collins had been adjudicated incapacitated as a result of Alzheimer's dementia. Terry's case-file memo states the following concerning her observations of Collins:
"On 10/07/2011, after observing the verbal responses of Ms. Collins, it was clear that Ms. Collins was not person, place, or time oriented. During the interview with Ms. Forrester, Ms. Collins continuously asked Ms. Forrester about different family members that she had indicated had passed away. Worker did not feel that an interview with Ms. Collins would be capable of giving accurate information; therefore, [Terry] did not ask to interview Ms. Collins alone."
Wiggins, Terry's supervisor, testified in her deposition that a private interview would not be necessary where the social worker personally observes the client and determines that the client is incoherent. Stakely, Terry's coworker, testified in her deposition that social workers have "leeway" concerning private interviews. Stakely specifically stated that a social worker is not required to interview a client privately when the client "has disorientation to the point that [he or she is] not able to communicate with [the social worker]." Although DHR policy and procedures required Terry to "see and interview" Collins, the policy and procedures nonetheless afforded Terry the discretion to use her judgment in determining whether to interview Collins privately, especially where, as here, Terry personally observed Collins and determined that she would be incapable of giving accurate information because she was not oriented to person, place, or time. See, e.g., Ex parte Estate of Reynolds, 946 So.2d at 457 ("[A]lthough the manuals required ALDOT workers to make frequent inspections of the roads to discover defects, the workers nonetheless were required to make judgments in performing this duty."). Accordingly, Washington has failed to establish, through his expert, that Terry is not entitled to State-agent immunity.
4. Terry's compliance with DHR policy and procedures concerning her personal observations of the affected areas of Collins's body
VanBuskirk opined that Terry violated DHR policy and procedures by failing to look at the inside of Collins's lip, by failing to address an area on Collins's forearm *1136 that Terry perceived to be a birthmark or some type of skin-to-skin contact, and by failing to inspect Forrester's entire home in order to get a full picture of the home. Where allegations of physical abuse are made, DHR policy and procedures require that the social worker "personally observe the affected areas" of the client's body. VanBuskirk conceded that the affected areas in this case were Collins's two black eyes, a swollen eye, and a busted lip, as indicated in the following DHR intake report:
"On 9/30/2011 at 4:15 p.m., Mr. Ronald Person called in regards to his grandmother Mildred Collins. Mr. Person stated that his aunt, Cherri Forrester, is caring for her. Mr. Person stated that his grandmother has two black eyes. Mr. Person stated that his grandmother has Alzheimer's and she does not remember the abuse. ... According to Mr. Person, Ms. Forrester has threatened to kill Ms. Collins. Mr. Person stated that he reported the information to Ms. Collins's son, and he was supposed to call but he didn't. Mr. Person stated this has been an ongoing situation and it needed to be investigated. Mr. Person stated that Ms. Forrester makes Ms. Collins stand in the middle of the living room naked. Mr. Person stated that he has pictures of when Ms. Collins's lip was busted and eye was swollen."
(Emphasis added.)
Terry's case-file memo indicates the following concerning her observations of Collins:
"On 10/07/11, [Terry] returned to the family's residence along with co-worker, Ms. Stakely. Ms. Forrester appeared to be cordial on this day. Once inside the home, [Terry] observed Ms. Collins sitting on the sofa dressed in a short-sleeved Capri outfit, which allowed visibility of her arms from the elbow to her hands. Ms. Collins' pants revealed visibility of her legs from the calf area to her feet. Ms. Collins' clothes were observed to be clean. [Terry] noticed an area on Ms. Collins's forearm that appeared as it might have been a birthmark or some type of skin-to-skin contact mark. [Terry] did not observe any other marks or bruises on Ms. Collins during the visit. [Terry] did not ask Ms. Forrester about the pictures mentioned by [Person] for risk that it would reveal the identity of the reporter."
(Emphasis added.)
In other words, Terry did not observe any marks or bruises on Collins's body other than a mark of undetermined origin on her forearm, which Terry perceived to be a "birthmark or some type of skin-on-skin contact mark." Terry testified in her deposition that Collins's face was "clean, clear of bruises" and that there was "just no sign of-indication of any kind of abuse." Stakely testified in her deposition as well that she did not observe any marks on Collins's body indicative of injury or that she felt necessitated a physical exam. According to VanBuskirk, however, when Terry saw the mark on Collins's forearm, she should have delved deeper. However, Terry's testimony is clear that she did not perceive the mark on Collins's forearm to be indicative of any kind of physical abuse. DHR policy and procedures required Terry only to "personally observe the affected areas," i.e., Collins's eyes and lips. Terry further testified that she did not look inside Collins's lip to see if it was busted because her lip was not swollen. In fact, Terry indicated in her case-file memo that Person's pictures denoting the black eyes, swollen eye, and busted lip were taken at least two weeks earlier when he contacted DHR about the alleged abuse. Person himself testified in his deposition that the pictures he took of Collins's black eyes, *1137 swollen eye, and busted lip were actually taken two months before he contacted DHR about the alleged abuse. Based on the foregoing, we conclude that Terry complied with DHR policy and procedures because she "personally observe[d] the affected areas" of Collins's body. Accordingly, Washington has failed to establish, through his expert, that Terry is not entitled to State-agent immunity.
We further find unavailing VanBuskirk's opinion that Terry violated DHR policy and procedures by failing to inspect Forrester's entire home in order to get a full picture of the home. The portion of DHR policy and procedures that requires the social worker "to get a full picture of the home" relates to unannounced visits; as previously indicated, Terry did not make an unannounced visit to Forrester's home before Collins's death. DHR policy and procedures require the social worker to personally observe the condition of the home, i.e., the kitchen, the bathroom, and the client's bedroom, only when there have been allegations of neglect and/or self-neglect.[3] It is undisputed that there was no report of neglect in this case, and VanBuskirk concedes as much in her deposition.
Based on the foregoing, we conclude that Washington failed to meet his burden of presenting substantial evidence, through his expert, that Terry acted beyond her authority by failing to discharge her duties, i.e., investigating the report that Collins was being abused, pursuant to DHR policy and procedures, because Terry complied with DHR policy and procedures concerning unannounced investigative visits, the need for involving law enforcement, private interviews of clients, inspections of the affected areas of a client's body, and inspections of the entire home.
Conclusion
Terry is entitled to State-agent immunity under the test set forth in Cranman. We hereby issue the writ of mandamus and direct the circuit court to vacate its order denying Terry's summary-judgment motion and to enter a summary judgment in her favor.
PETITION GRANTED; WRIT ISSUED.
Stuart, C.J., and Parker, Shaw, Main, Wise, and Bryan, JJ., concur.
Murdock, J., concurs in the result.
MURDOCK, Justice (concurring in the result).
In 2000, this Court attempted to articulate five defined categories within which allegedly wrongful conduct must fit to qualify for State-agent immunity, abandoning the general "discretionary public function" standard against which State-employee conduct had been measured up until that time. See Ex parte Butts, 775 So.2d 173 (Ala. 2000), adopting the analysis of the plurality in Ex parte Cranman, 792 So.2d 392, 405 (Ala. 2000). For the most part, the Cranman analysis attempted to delineate the activities that fall on the immunity side of a line "between conduct involved in planning or decision-making in *1138 the administration of government and the conduct of those required to carry out the orders of others or to administer the law with little choice as to when, where, how, or under what circumstances their acts are to be done." Cranman, 792 So.2d at 402. Such an endeavor, of course, ran the risk that the attempt to articulate such defined and limited categories would fail to anticipate every circumstance that should qualify a state actor for immunity and/or that would be captured by an appropriately worded general standard.
The conduct of a Department of Human Resources ("DHR") social worker conducting a field investigation and deciding upon appropriate actions in response thereto is an example of the type of activity that is quintessentially governmental in nature and that involves substantial "public-function discretion" but that was not fairly captured by any of the five so-called Cranman categories. In particular, I do not believe it is captured by category 3, which applies only "insofar as [a] statute, rule or regulation prescribes the manner for performing ... duties" and "the State agent performs the duties in that manner." 792 So.2d at 405. It does not appear to me that the "rules" at issue in this case "prescribe the manner" in which a DHR field agent must perform the duties at issue in a case like this but, instead, as thoroughly explained in the main opinion, imbue the DHR employee with meaningful discretion at almost every turn. (Instead of applying to discretionary activity such as that at issue in this case, a notion incompatible in my view with a plain reading of the language of category 3, it appears to me that category 3, unlike the other categories of Cranman immunity, was intended merely to refer to the execution by state employees of simple "ministerial duties.") In my special writing in Ex parte Randall, 971 So.2d 652, 672 (Ala. 2007) (Murdock, J., dissenting), I expressed these concerns.
In deference to the fact that the Court in Randall nonetheless chose to treat such DHR social-worker investigative activity as falling into category 3, I since have concurred in such cases as Ex parte Jefferson County Department of Human Resources, 63 So.3d 621 (Ala. 2010), and Ex parte Jones, 52 So.3d 475 (Ala. 2010). In hindsight, perhaps I should have, at most, "concurred in the result" in such cases so as not to suggest agreement with the notion that the type of conduct at issue in those cases actually fell within the category of conduct articulated in category 3 in Cranman. That is the approach I take today. In other words, in today's case, I vote to "concur in the result" reached by the main opinion because, although I can agree that such investigative activity is of the discretionary, quintessentially governmental nature that should qualify the actor for State-agent immunity, I cannot agree that category 3 as articulated in Cranman describes this activity. I believe we should acknowledge the latter fact and consider the need for a more general standard or, if we are to continue attempting to articulate defined "buckets" within which activity must fall in order to qualify for State-agent immunity, the need for an additional "bucket" that actually describes the type of activity at issue in cases such as this. See generally Ex parte Randall, 971 So.2d at 670 (Murdock, J., dissenting) ("If this Court is of the opinion that there is or should be some additional catchall category for the discretionary execution of governmental policy generally, it is incumbent upon us to so state and to express the parameters of that category.").
My vote to concur in the result in the present case also is a function of my disagreement with the "beyond-authority" exception to State-agent immunity that has been adopted by this court and that, understandably, is reflected in the main opinion.
*1139 See Ex parte Ingram, 229 So. 3d 220, 234 (Ala. 2017) (Murdock, J., concurring specially). In fact, this case highlights a significant reason why, in my opinion, the beyond-authority exception to State-agent immunity is misplaced.
The attempted application of the beyond-authority exception, at least as that exception has been understood by this Court, in a case like this one, in which the qualifying category for immunity is category 3 in the Cranman restatement, inherently requires us to engage in an analysis that either is redundant or risks contradictory results. I am not sure how, on the one hand, we can conclude that category 3 immunity applies because we have determined that a "statute, rule, or regulation prescribes the manner for performing the duties and the State agent perform[ed] the duties in that manner," Cranman, 792 So.2d at 405 (emphasis added), only to follow that very conclusion with a second inquiry, this time for purposes of the beyond-authority exception, into whether the State actor has "failed to discharge duties pursuant to detailed rules or regulations," Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006) (emphasis added). This analytical inconsistency seems to serve as further verification that the beyond-authority exception simply is out of place in State-agent-immunity analysis (and should not have been imported by Cranman from the State-immunity cases where it was and is recognized as an exception to the prohibition of actions for injunctive relief against state actors in their official capacities). See Ingram, supra (Murdock, J., concurring specially).

A copy of the Lee County Probate Court order, adjudicating Collins incapacitated and granting letters of guardianship to Forrester, is included in the materials before us.

Terry indicated in one of her assessment narratives that, during her October 7, 2011, investigative visit, Collins was moving back and forth in a rocking motion, that Collins repeatedly made small outbursts during her conversation with Forrester, and that Collins stated to Stakely that she knew her-to which Stakely replied "yes, you do." Stakely explained to Forrester that she had been involved with Collins years earlier because Collins "had been driving erratically in town and on the outskirts."

The DHR policy and procedures manual defines neglect as follows:
"Neglect, according to Section 38-9-2, [Ala. Code 1975,] Amended, means, 'The failure of a caregiver to provide food, shelter, clothing, medical services or health care for the person unable to care for himself or herself; or the failure of the person to provide these basic needs for himself or herself when the failure is the result of the person's mental or physical inability.' Lack of supervision, while not specifically defined in the statute, may meet the definition of neglect when lack of supervision results in lack of food, shelter, clothing, medical services or health care."